**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DONNA J.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 19 C 2957** |
| | ) | |
| **ANDREW M. SAUL,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Donna J. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") partially denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA") and awarding a closed period of benefits. (Doc. 1). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 6, 7). Plaintiff filed a brief arguing that the Commissioner's decision should be reversed or the case remanded, and the Commissioner filed a motion for summary judgment arguing that the decision should be affirmed. (Docs. 13, 20, 21). After careful review of the record and the parties' respective arguments, the Court affirms the Commissioner's decision.

## BACKGROUND

Plaintiff applied for DIB on June 24, 2016, alleging disability since August 9, 2012 due to right foot fracture of the metatarsal bone with nonunion and acquired hallidus. (R. 53-54, 56-57, 89-90, 96, 98, 179-82). Born in September 1958, Plaintiff was 53 years old at the time of the alleged onset date (R. 89, 97, 179), making her a person closely

approaching advanced age (age 50-54).  20 C.F.R. § 404.1563(d).  Plaintiff subsequently changed age category (R. 26) to that of a person of advanced age (age 55 or older).  20 C.F.R. § 404.1563(e).  Her date last insured was December 31, 2015.  (R. 89, 97). Plaintiff completed two years of college and last worked at Walmart (most recently, as a supervisor) from 2006 until 2010 or 2011 when her employment was terminated.  (R. 43-46, 53, 215, 261).

The Social Security Administration denied Plaintiff's applications initially on October 3, 2016 and on reconsideration on January 5, 2017.  (R. 96, 105-06, 111-14). Plaintiff then requested a hearing, which was later held before Administrative Law Judge ("ALJ") Victoria Ferrer on March 20, 2018, where Plaintiff was represented by counsel. (R. 36-88, 123-24).  Both Plaintiff and Vocational Expert ("VE") Mary Schmit testified at the hearing.  (R. 43-86, 257).

The ALJ denied Plaintiff's claims in a decision dated May 25, 2018.  (R. 16-31). The ALJ found that Plaintiff's osteoarthritis of the metatarsal bones (with history of fracture and nonunion), history of bunion surgeries, degenerative disc disease of the cervical spine since 2014, and mild obesity are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 19-23, 28).  The ALJ concluded that, from the August 9, 2012 alleged onset date to January 18, 2016, Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following limitations: occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally crouching; and never working at high exposed places. (R. 23).  The ALJ accepted the VE's testimony that a person with Plaintiff's background and RFC could perform jobs that existed in significant numbers in the national economy,

namely Office Helper, Fundraiser, and Sales Attendant. (R. 26-27, 82-85). As a result, the ALJ found that Plaintiff was not disabled from August 9, 2012 until her age category changed to advanced age in September 2013, at which time she became disabled by direct application of the Medical-Vocational Guidelines. (R. 16, 27-28).

The ALJ concluded that, beginning on January 19, 2016, Plaintiff experienced medical improvement related to the ability to work because her RFC increased to the full range of medium work. (R. 28-29). Consistent with the VE's testimony, the ALJ found that, at this RFC, Plaintiff is able to perform her past relevant work as a Department Manager. (R. 30, 77). The ALJ also found that Plaintiff could perform jobs that exist in significant numbers in the national economy by direct application of the Medical-Vocational Guidelines. (R. 31). As a result, the ALJ determined that Plaintiff was not disabled from January 19, 2016 through the date of the decision. (R. 16-17, 31). The Appeals Council denied Plaintiff's request for review on March 6, 2019 (R. 1-6), rendering the ALJ's May 25, 2018 decision the final decision of the Commissioner reviewable by this Court. *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

In support of her request for reversal or remand, Plaintiff argues that the ALJ erred in: (1) finding that medical improvement occurred as of January 19, 2016 despite evidence of continuing right foot and neck pain; (2) evaluating the August 31, 2016 opinion of her treating orthopedic surgeon, Armen Kelikian, M.D.; (3) failing to explain why the RFC did not include any restrictions to accommodate her mild mental limitations; and (4) assessing the subjective symptom allegations. For reasons discussed below, the Court finds that the ALJ's decision is supported by substantial evidence.

**DISCUSSION**

I.     **Governing Standards**

A.     **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the SSA.  In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the applicable regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'"  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'"  *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)).  Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."

*Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

### B.     Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA.  *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016).  A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).  If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five.  *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## II.    Analysis

### A.     Medical Improvement

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in finding that medical improvement occurred as of January 19, 2016 despite

evidence of continuing right foot and neck pain. (Doc. 13, at 4-10). Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A finding of decreased medical severity must be based on "changes in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." *Id.*; *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011). "'When, as here, the ALJ finds the claimant disabled for a closed period in the same decision in which she finds medical improvement, the severity of the claimant's current medical condition is compared to the severity of the condition as of the disability onset date.'" *Wofford v. Berryhill*, No. 16 C 4185, 2017 WL 1833186, at *4 (N.D. Ill. May 8, 2017) (quotation omitted).

As noted, the ALJ found that Plaintiff was disabled from September 2013 (when her age category changed to advanced age) to January 18, 2016, during which time she retained the RFC to perform light work with the following limitations: occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally crouching; and never working at high exposed places. (R. 16, 23, 27-28). The ALJ determined that Plaintiff was limited to light work "[i]n consideration of her subjective pain complaints of her neck and right foot[.]" (R. 25). The ALJ added postural limitations "[d]ue to her pain and mild obesity" that restricted Plaintiff as to climbing and crouching. (R. 25-26). The ALJ also included a limitation that Plaintiff not work in high exposed places "[d]ue to her medication regimen and pain with alleged balance issues although not fully supported." (R. 25). Plaintiff does not challenge the RFC finding of light work with additional restrictions through January 18, 2016.

The ALJ concluded that as of January 19, 2016, however, Plaintiff experienced medical improvement as a result of successful right big toe fusion surgery. (R. 28-30). This increased Plaintiff's RFC to the full range of medium work, enabling her to perform her past job as a Department Manager and other jobs. (R. 16-17, 28-31, 77). In challenging this determination, Plaintiff first contends that the ALJ did not identify specific evidence showing improvement of the right foot. (Doc. 13, at 4-6). To the contrary, the ALJ's decision includes a detailed discussion of the medical records, which document Plaintiff's improvement with right foot treatment. (R. 20, 22-25, 29-30).

Prior to the August 2012 alleged onset date, Plaintiff underwent bunion surgery in August 2011 followed by nonunion repair surgery with screw fixation first metatarsal in October 2011. (R. 20, 23, 275-78, 285-90). In February 2012, orthopedic surgeon Dr. Kelikian performed a revision of a nonunion of the right foot first metatarsal from previous podiatric surgery. (R. 20, 432-33, 477-81). By May 2012, Plaintiff was doing well, and x-rays showed good healing. (R. 20, 422-28, 475-77). Primary care and emergency treatment records in 2013 and 2014 consistently noted that Plaintiff walked without difficulty. (R. 20, 22, 25, 326, 346, 352, 355, 360, 363, 367).

Plaintiff received no further treatment for her right foot until nearly three years later, when she again saw Dr. Kelikian for right foot pain in January 2015 (during the closed period of disability that began in September 2013). (R. 20, 24-25, 307, 420-22, 470-75). In February 2015, Plaintiff underwent right big toe fusion surgery. (R. 20, 434-36, 440-41, 468-69). She routinely followed up with Dr. Kelikian for the rest of the year. (R. 411-20, 450-51, 456-58, 462-70). During that time, she wore a post-operative shoe and could participate in walking. (R. 20, 29, 450, 457, 463, 465, 467). In August 2015, a different

orthopedic doctor observed that Plaintiff did not walk with an antalgic gait when evaluating her knee pain.  (R. 20, 29, 458-62).   September 2015 x-rays of the right foot showed "[s]tatus post right first MTP arthrodesis without significant fusion and with moderate swelling" and "[s]cattered degenerative changes bilaterally."  (R. 20, 411-13).   Upon review of the x-rays, Dr. Kelikian noted "anatomical alignment, pathological findings well aligned some consolidation[,]" and he discontinued Norco and prescribed Tramadol.  (R. 20, 456-58).   In November 2015, Dr. Kelikian recommended athletic/recreational and dress/formal shoes.  (R. 20, 443-44, 449-51).

Plaintiff saw Dr. Kelikian twice more in 2016.  X-rays on January 18, 2016 revealed no acute fracture or subluxation of the post-surgical right foot and included findings of moderate degenerative changes at the first metatarsophalangeal (MTP) joint, mild degenerative changes in the remaining digits, degenerative changes in the mid and hindfoot, and ossification of the insertion of the Achilles tendon.  (R. 29, 409-11).   The same day, Dr. Kelikian reviewed the x-rays and noted "anatomical alignment, pathological findings well aligned 1st mtp fusion[;]" again made non-orthopedic shoe recommendations; and said that Plaintiff could participate in activity as tolerated.  (R. 29, 447-49).  X-rays of the right foot in July 2016 included similar findings as in January 2016.  (R. 29, 407-09).   On review of those x-rays, Dr. Kelikian noted "anatomical alignment, pathological findings well aligned partial mtp fusion" and reiterated that Plaintiff could participate in activity as tolerated.  (R. 29, 445-46).  Plaintiff received no further orthopedic treatment for her foot.  (R. 20, 29).   Primary care treatment records in September and November 2016 did not document problems walking.  (R. 20, 24, 29, 539-40, 546-47, 549-50).

In March 2017, Plaintiff saw Kiranjit Deol, M.D. for a complete physical and reported having all new doctors because her insurance had changed. (R. 29, 668-74). She complained of chronic pain in her right foot, for which she took Tramadol. (R. 29, 668). Plaintiff continued to see Dr. Deol through January 2018, and he noted normal findings on examination of the extremities and musculoskeletal system, including as to gait in July 2017 and January 2018. (R. 22, 29, 672, 675-79, 700). Other treatment records in 2017 did not document problems walking. (R. 20, 24, 29, 781-82, 786-87). According to mental health treatment notes in October 2017, Plaintiff had not taken Tramadol for three months. (R. 29, 719). In November 2017, Plaintiff reported "good control" of her right foot pain with Tramadol, and Dr. Deol described her chronic right foot pain due to failed bunionectomy as stable. (R. 680-85).

Based on the foregoing treatment records and Plaintiff's testimony that her right foot had improved since the February 2015 big toe fusion surgery, the ALJ determined that Plaintiff experienced medical improvement as of January 19, 2016—the day after Dr. Kelikian's January 18, 2016 post-surgical follow-up examination—resulting in an increased RFC to medium work. (R. 28-30, 57-58). The ALJ focused on "diagnostic testing that evidences improvement" and specifically relied on Dr. Kelikian's January 18, 2016 and July 2016 records documenting Plaintiff's well-aligned MTP fusion from the doctor's review of x-rays of the right foot (though declined to give even slight weight to the doctor's opinion regarding Plaintiff's physical limitations, as discussed later). (R. 29, 407-11, 445-49). Plaintiff complains that those x-rays also noted degenerative changes. (Doc. 13, at 4-6). The ALJ expressly acknowledged those findings (R. 29, 407-11), and

Plaintiff offers no explanation as to how they undermine the conclusion that her right foot had improved as a result of fusion surgery.

Plaintiff also ignores objective examination findings demonstrating improvement (R. 29-30), and instead points to her report of foot pain to Dr. Deol in March 2017. (Doc. 13, at 8, citing R. 668). However, Plaintiff fails to acknowledge the remainder of Dr. Deol's treatment records from 2017 to 2018 that reflect normal findings and good pain control on Tramadol. (R. 29, 672, 675-85, 700). Plaintiff otherwise relies on subjective complaints made in her function report and testimony, as well as the notation of a field office employee that she "had a cane with her to help with her walking" (Doc. 13, at 7-8, citing R. 66-67, 211, 244-54; Doc. 25, at 4), but identifies no medical records demonstrating ongoing limitations resulting from foot problems.

Plaintiff next asserts that the ALJ did not address her neck problems in finding medical improvement. (Doc. 13, at 9). To the contrary, the ALJ's decision includes a detailed discussion of the medical records regarding Plaintiff's neck treatment. (R. 22, 24-25, 29). Plaintiff first complained of neck related pain in 2014 (during the closed period of disability that began in September 2013). (R. 24). In September and early October 2014, she reported left side neck pain and left arm weakness to her primary care provider, who diagnosed shoulder and upper arm sprain/strain. (R. 359-64, 366-68).

In early October 2014, Plaintiff was hospitalized for several days with left side neck and jaw pain. (R. 24, 314-17, 325-40). At that time, an x-ray of the cervical spine revealed mild levoscoliosis and reverse curvature, suggesting muscle spasm; mild to moderate spondylosis with narrowing of the lower four discs and mild to moderate spurring; no vertebral compressions; grade 1 retrolisthesis of C2 in relation to C3; spines intact; and

facet joint arthritis in the mid and lower cervical spine. (R. 22, 300-01). An x-ray of the left shoulder showed no displaced fracture or dislocation and no other significant abnormalities. (R. 302-03). A CT scan of the cervical spine indicated degenerative cervical spondylosis; and multilevel central canal and foraminal stenosis, most prominent and mild to moderate in degree at the C5-6 and C6-7 levels. (R. 22, 304-05). A physician who examined Plaintiff at that time noted mild degenerative changes shown on the CT scan and "believe[d]" the pain was "more related to her jaw and dental work than for neck itself." (R. 24, 314-15).

In mid October 2014, an ear, nose, and throat doctor evaluated Plaintiff for neck pain and swelling, diagnosed cervicalgia, and recommended physical therapy. (R. 24, 320-22). Findings on examination, including as to range of motion of the neck, were normal. (*Id.*). Around the same time, Plaintiff also visited her primary care provider, who diagnosed cervical radiculitis. (R. 369-73). Plaintiff received physical therapy for left neck and shoulder pain and stiffness from late October to mid December 2014. (R. 24, 318-19, 609-63). In completing therapy-related paperwork in December 2014, Plaintiff said that her health was good; her health limited her ability to do moderate activities a little, but did not limit her ability to climb several flights of stairs at all; and, during the past week, her activities were limited a little of the time. (R. 24, 621). On discharge, she had met all goals and made improvements with range of motion, strength, flexibility, joint mobility, soft tissue mobility, and lifting mechanics, which had increased her abilities to clean, dust, drive, wash overhead, lift overhead, perform overhead tasks, carry, use a computer and mouse, sleep for more than six hours, and care for her grandchildren. (R. 24, 650).

More than ten months later, in late September 2015, Plaintiff saw orthopedic surgeon Cherise Russo, D.O. and reported left side neck pain but no pain, numbness, or tingling in the arm.  (R. 24, 452-56).  Examination revealed upper extremity and left shoulder strength testing of 4/5 to 5/5, some abnormal left shoulder findings, and some tenderness.  (R. 24, 454).  Dr. Russo diagnosed suspected cervical spondylosis and degenerative disc disease by history, left shoulder pain likely secondary to referred pain from the cervical spine, and "mild RC syndrome" and prescribed Meloxicam.  (R. 24, 455).  Dr. Russo did not recommend narcotics.  (R. 455).  Plaintiff received no further orthopedic treatment for her neck.  (R. 24).  In late December 2015, she complained of neck pain to her primary care provider, who diagnosed neck arthritis.  (R. 383-85).

When Plaintiff saw Dr. Deol for a physical in March 2017, she complained of chronic pain in her shoulders and neck (in addition to right foot pain), for which she took Tramadol.  (R. 29, 668).  Dr. Deol consistently noted normal findings on examination of the neck, extremities, and musculoskeletal system.  (R. 29, 672, 675-79, 700).  In November 2017, Dr. Deol described Plaintiff's chronic bilateral shoulder pain due to osteoarthritis as stable.  (R. 680-85).

Plaintiff ignores the foregoing evidence of minimal neck treatment that concluded before medical improvement occurred on January 19, 2016.  While Plaintiff proffers complaints of neck pain to primary care providers in December 2015 and March 2017 (Doc. 13, at 7-8, citing R. 383-84, 668), she disregards Dr. Deol's records from 2017 to 2018 that reflect normal examinations and controlled pain.  (R. 29, 672, 675-85, 700).  Plaintiff fails to identify any medical records showing ongoing limitations resulting from neck issues.

Plaintiff additionally cites primary care records from 2017 stating that she was obese, generally claiming that the combination of her foot problems, neck issues, and obesity continued to "seriously" limit her functioning.  (Doc. 13, at 8-9, citing R. 687).  Plaintiff does not elaborate.  In any event, the ALJ considered her obesity.  (R. 22, 29, 320, 672).  And, as with the right foot and neck pain, Plaintiff proffers no medical evidence to support a greater degree of limitation than the ALJ found due to obesity.

Finally, Plaintiff objects that the ALJ impermissibly "determine[d] the significance of medical evidence without expert input."  (Doc. 13, at 6-7) (citing *Lambert v. Berryhill*, 896 F.3d 768, 774-75 (7th Cir. 2018); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016)).    Given the circumstances here, the cases on which Plaintiff relies are distinguishable.  In *Lambert*, the Seventh Circuit rejected the ALJ's conclusion that there was no objective basis for a treating physician's opinion based on normal findings on x-rays of the spine where no medical source had opined that those results were inconsistent with disabling pain, and the plaintiff's doctors had performed surgeries, prescribed pain medications, and recommended long-term pain management notwithstanding imaging ruling out objective causes.  896 F.3d at 774.  And in *Stage*, the  Seventh Circuit found that the ALJ erred in continuing to rely on an outdated state agency reviewing physician opinion and instead personally evaluating the significance of a subsequent orthopedic surgeon's report diagnosing the plaintiff with significant hip deformity, finding restricted range of motion, and recommending total hip replacement surgery.  812 F.3d 1123, 1125.

In this case, however, the ALJ relied on a doctor's view of the diagnostic evidence.  Specifically, Dr. Kelikian concluded that the January and July 2016 right foot x-rays showed well-aligned MTP fusion, as discussed above.  In addition, this case does not

involve persistent adverse findings or extensive treatment. Rather, the ALJ relied on treatment records consistently reflecting that Plaintiff was doing well following right foot surgery in 2015 and received no further orthopedic treatment for her foot after 2016. Equally unavailing on this record—which shows consistent improvement of the right foot—is Plaintiff's claim that medical expert testimony was necessary because the "medical findings are unclear." (Doc. 13, at 9-10; Doc. 25, at 5 n.2, 8). *See Tasha C. v. Saul*, No. 18 C 4677, 2019 WL 6877190, at *8 (N.D. Ill. Dec. 17, 2019) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)) (" . . . medical expert is only required 'when the evidence received is inadequate to determine whether the claimant is disabled.'").

Viewing the record as a whole, the ALJ did not err in determining that Plaintiff experienced medical improvement as of January 19, 2016, and the case need not be remanded for further consideration of this issue.

## B. Treating Physician Opinion

Plaintiff also challenges the ALJ's evaluation of the opinion of treating orthopedic surgeon Dr. Kelikian. (Doc. 13, at 12-14). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as he provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). That is to say, the ALJ must offer "good

reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6); *see Simila*, 573 F.3d at 515.

In determining that Plaintiff experienced medical improvement, the ALJ considered Dr. Kelikian's opinion but declined to give it even slight weight. (R. 30).[1] By way of background, on August 31, 2016, Dr. Kelikian completed an assessment of Plaintiff's physical functioning, identifying her diagnosis as status post first MTP fusion. (R. 799-801). He wrote that Plaintiff had no symptoms (including pain), received no treatment, and experienced no medication side effects. (R. 799). Dr. Kelikian opined that Plaintiff could: walk three blocks without rest or severe pain; sit or stand for 30 minutes at a time; stand/walk for about two hours total in an eight-hour workday; lift and carry 50 pounds rarely, 10 and 20 pounds occasionally, and less than 10 pounds frequently; never climb ladders and occasionally climb stairs; and frequently twist, stoop/bend, and crouch/squat. (R. 800-01). She needed a job that permitted shifting positions at will and included periods of walking every 30 minutes for 15 minutes each time. (R. 800). With prolonged sitting, Plaintiff needed to elevate her leg(s) to waist height for 25% of the day due to pain.

---

[1] In finding that Plaintiff retained the RFC to perform light work with additional limitations and, as such, was disabled from September 2013 to January 18, 2016, the ALJ accorded Dr. Kelikian's opinion slight weight. (R. 26). While Plaintiff focuses on the decision to afford Dr. Kelikian's opinion slight weight, the Court assumes that she does not dispute the ALJ's treatment of the opinion in awarding a closed period of disability but rather in finding her no longer disabled due to medical improvement.

(*Id.*).  She likely would be off task 10% of the day and absent from work about two days per month.  (R. 801).

The ALJ found that this opinion from Plaintiff's treating orthopedic foot surgeon was internally inconsistent because: despite the absence of symptoms (including pain) and medication side effects, Dr. Kelikian imposed "significant functional limitations" as to sitting, standing, and walking; and, while the doctor noted the absence of pain, he nonetheless said that Plaintiff needed to elevate her legs because of pain.  (R. 25-26). The ALJ noted that Dr. Kelikian otherwise described "some" restrictions on lifting and carrying consistent with medium and light work.  (R. 25).  The ALJ also criticized the lack of detail provided on the preprinted form—including Dr. Kelikian's failure to specify any timeframe, objective examination findings, or diagnostic test results—as "not very persuasive."  (R. 26).  The ALJ additionally explained that Dr. Kelikian relied solely on a finding of tenderness, which is "subjective by nature."  (*Id.*).[2]  The ALJ further concluded that the opinion was "inconsistent with the longitudinal record" of Dr. Kelikian's treatment notes, as well as those of other providers, documenting "reduced treatment and good findings" on examination "especially . . . after the closed period of disability . . . . "  (26, 29-30).  For these reasons, the ALJ discounted Dr. Kelikian's opinion and declined to give it even slight weight in determining medical improvement.  (R. 25-26, 30).

Plaintiff principally disputes the ALJ's conclusion that Dr. Kelikian's opinion lacked objective support based on the January and July 2016 x-rays of the right foot showing degenerative changes.  (Doc. 13, at 13; Doc. 25, at 12-13).  As an initial matter, Dr.

---

[2]    When asked to identify clinical findings and objective signs, Dr. Kelikian wrote "tender[.]" (R. 799).  Though the handwriting is somewhat illegible, Plaintiff agrees with this reading.  (*See* Doc. 25, at 13 n.6).

Kelikian's opinion makes no mention of these x-rays (or any other objective findings). Moreover, Plaintiff's singular focus on the x-rays fails to account for the bulk of the record evidence reflecting improvement following the most recent right foot surgery, as discussed above.  For example, the ALJ specifically addressed Dr. Kelikian's treatment notes documenting Plaintiff's well-aligned MTP fusion based on the x-rays, imposing no walking restrictions, releasing Plaintiff from walking to engaging in activity as tolerated, recommending regular shoes, and revealing no further orthopedic foot treatment after July 2016.  (R. 20, 29, 407-11, 445-51, 457).  The ALJ also considered other providers' records: indicating normal gait or evincing no difficulty walking from 2015 to 2018; and reflecting controlled pain on Tramadol and normal examinations in 2017 and 2018.  (R. 20, 24, 29, 458-62, 539-40, 546-47, 549-50, 672, 675-85, 700, 781-82, 786-87).  And while Plaintiff criticizes the ALJ's omission of pinpoint citations to evidence inconsistent with Dr. Kelikian's opinion when discussing the reasons for discounting his opinion (Doc. 13, at 14, citing R. 26; Doc. 25, at 13), she ignores the ALJ's fulsome discussion of this evidence throughout the decision.  (R. 20, 22, 24-25, 29-30).  *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("it is proper to read the ALJ's decision as a whole.").

Plaintiff does not directly attack the ALJ's additional findings that Dr. Kelikian's opinion lacked both internal consistency and sufficient detail, instead asserting "that the ALJ was required to recontact" the doctor to clarify the applicable timeframe of the stated limitations and to elicit any objective supporting evidence.  (Doc. 13, at 13; Doc. 25, at 11-12, 14 n.7).  However, "[a]n ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d at 504.  Again, that was not the case where the treatment records

of Dr. Kelikian and other providers consistently documented improved or normal findings following Plaintiff's right big toe fusion surgery, as discussed above. *See Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2018) (ALJ was not required to recontact physician "because the record contained adequate information for the ALJ to render a decision.").

Finally, Plaintiff contends that the ALJ did not explain why Dr. Kelikian's specialty and long treating relationship did not warrant according his opinion more weight. (Doc. 13, at 12; Doc. 25, at 11-12). After declining to afford the treating physician's opinion controlling weight, the ALJ was required to address what weight the opinion merited considering the regulatory factors. *See* SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996) (treating source opinions "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527"). On the record in this case, the ALJ "sufficiently accounted for the factors" by acknowledging that Dr. Kelikian was an orthopedic foot surgeon, discussing in detail his treatment of Plaintiff first in 2012 and again from 2015 to 2016, considering the lack of objective support for his opinion, and addressing the inconsistency of his opinion with the record as a whole. (R. 20, 24-26, 29-30). *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013) (while the ALJ "did not explicitly weigh each factor in discussing" the treating physician's opinion, the decision made clear that "he was aware of and considered many of the factors, including" treatment relationship, consistency with the record as a whole, and supportability).

Viewing the record as a whole, the ALJ did not err in declining to give even slight weight to the opinion of treating orthopedic surgeon Dr. Kelikian in determining that Plaintiff experienced medical improvement.

### C.    Mental RFC

Plaintiff objects that the ALJ failed to explain why the RFC did not include any restrictions to accommodate her mild mental limitations in determining that she retained the RFC to perform a full range of medium work.  (Doc. 13, at 8 n.8, 10-12; Doc. 25, at 9-11).  A claimant's RFC is the maximum work that she can perform despite any limitations.  *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).  "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions."  *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).  "When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment" and "may not dismiss a line of evidence contrary to the ruling."  *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).

Plaintiff argues that, by omitting mental limitations from the RFC "without explanation," the ALJ failed to account for her non-severe mental impairments.  (Doc. 13, at 10-11).  By way of support, Plaintiff principally relies on *Iora P. v. Berryhill*, where the ALJ noted mild mental limitations at step two, but offered no rationale for not including non-exertional limitations in the RFC such that the court could not follow the ALJ's reasoning.  No. 18 C 3640, 2019 WL 1112272, at *3 (N.D. Ill. Mar. 11, 2019).  In *Iora P.*, the court remanded because "[n]owhere in the ALJ's RFC assessment or corresponding explanation [did] the ALJ address the mild mental limitations discussed at step two" which

"cannot stand in for an RFC determination."  *Id.* (citing SSR 96-8p, 1996 WL 374184, at *4).

Here, the ALJ's decision includes a detailed discussion of the medical records regarding Plaintiff's mental health treatment.  (R. 18, 21).  Primary care treatment records in May 2014 listed Plaintiff's medications, including for anxiety (Ativan) and depression (Imipramine).  (R. 18, 354).[3]  On visits for physical ailments in May and October 2014, mental status and psychiatric examinations were normal.  (R. 18, 326, 355).  In completing a physical therapy questionnaire regarding neck impairment in November 2014, Plaintiff said that she could concentrate fully with no difficulty.  (R. 18, 629-30).  On discharge from physical therapy in December 2014, Plaintiff reported a "good understanding [of] and compliance with HEP" (home exercise program).  (R. 18, 609).  On visits for physical issues in 2015 and 2016, neurological examinations showed that Plaintiff was alert, oriented, in no acute distress, pleasant, and conversational.  (R. 18, 454, 541, 550).

In September 2016, Paul Carter, M.D. performed a psychiatric diagnostic evaluation.  (R. 18, 764-72).  Plaintiff identified caring for her mother as a source of stress.  (R. 18, 770).  Dr. Carter diagnosed Plaintiff with major depressive disorder, generalized anxiety disorder, and adjustment disorders with anxiety.  (R. 764-65).  A mental status examination was unremarkable.  (R. 21, 767).  Plaintiff visited this practice for medication management, mostly without counseling, monthly for the rest of 2016 and periodically from January to October 2017.  (R. 21, 716-34, 736-63).

In January 2017, Plaintiff reported feeling "much better" and being "very satisfied" with the psychiatric medication regimen.  (R. 21, 746-47).  She denied side effects and,

---

[3]    *See* https://www.drugs.com/ (last visited June 1, 2021).

in July 2017, stated that her symptoms were "well controlled." (R. 21, 736, 741-42). In September 2017, Plaintiff's mood was euthymic; her thought process was logical; and her perception, thought content, insight, and judgment were within normal limits. (R. 21, 727). As of September 2017, Balin Durr, M.D. diagnosed Plaintiff with major depressive disorder in full remission and generalized anxiety disorder. (R. 21, 717, 724).

Meanwhile, when Plaintiff saw Dr. Deol for a complete physical in March 2017, she reported that her anxiety and depression were controlled on medications. (R. 21, 668-74). From 2017 to 2018, Dr. Deol consistently recorded normal mood, affect, and behavior on psychiatric examinations. (R. 18, 672, 678, 683, 700). Dr. Deol generally described Plaintiff's anxiety and depression as stable or controlled, though he noted her report of stress in July 2017 related to her mother's move to an assisted living facility and additionally indicated mild symptoms of anxiety and depression in November 2017 after her mother's death. (R. 673, 675, 677, 684).

Based on the foregoing treatment records, the ALJ determined at step two that Plaintiff's medically determinable mental impairments of anxiety and depression in full remission were non-severe and caused mild limitation in understanding, remembering, or applying information; mild limitation in terms of interacting with others; mild limitation as far as concentrating, persisting, or maintaining pace; and no limitation in adapting or managing oneself. (R. 18, 21-22). As the ALJ noted, Plaintiff testified that she was unable to work primarily due to physical impairments. (R. 18, 54, 56-57, 62-63). The ALJ also acknowledged Plaintiff's claimed stressors, including having physical impairments and caring for her mother before she died. (R. 18, 21, 64-65, 244, 246, 251). Still, the ALJ found that treatment notes did not reveal that Plaintiff had difficulty understanding

information, but rather documented her good understanding of and compliance with a physical therapy home exercise program. (R. 18). Physical therapy records also included Plaintiff's own report that she was able to concentrate. (*Id.*). The record contained no evidence of problems dealing with people and instead reflected that Plaintiff got along with family; did things with her husband, daughter, and grandchildren; and cared for her mother. (R. 18, 21, 25). The medical evidence further demonstrated that Plaintiff experienced good results with medication, minimal mental health treatment, and no inpatient psychiatric hospitalizations. (R. 21).

In determining that Plaintiff retained the RFC to perform medium work as of January 19, 2016, the ALJ briefly stated that treatment records documented normal psychiatric and neurological findings. (R. 29). When reading the ALJ's decision as a whole, *see Rice*, 384 F.3d at 370 n.5, the extensive discussion at step two of Plaintiff's mental health treatment records as well as her functional abilities is sufficient to trace the ALJ's reasoning for declining to include mental limitations in the RFC finding. *See Simila*, 573 F.3d at 513. "While it is true that the ALJ might have strengthened her RFC determination by referring to this evidence again in the portion of her decision that addressed plaintiff's RFC," this analysis of the mental impairments nonetheless supported the ultimate finding that Plaintiff was not disabled and neither disregarded contrary evidence nor ignored the problem altogether. *Fody v. Colvin*, 169 F. Supp. 3d 804, 809 (N.D. Ill. 2015).

Plaintiff speculates that "she likely could not have performed" her past skilled work as a department manager (or other jobs) (Doc. 13, at 11, citing R. 26, 30, 77; Doc. 25, at 10), yet adduces no evidence of additional functional limitations resulting from her mild

mental impairments. Plaintiff cites her complaints of difficulties with stress, memory, instructions, and authority figures (Doc. 13, at 11, citing R. 75, 246, 250-51), but fails to acknowledge the inconsistent medical evidence documenting her abilities to understand and follow home exercise instructions, concentrate, and get along with others that the ALJ addressed. Nor does Plaintiff identify contrary findings that the ALJ overlooked. While Plaintiff points to the treatment records of Drs. Carter, Burr, and Deol, reflecting her diagnoses, reported symptoms, and medications (Doc. 13, at 10-11, citing R. 668-71, 683, 716-19, 738, 749-51, 761-65), she ignores the generally favorable clinical mental health findings, including repeatedly normal psychiatric and neurological examinations, consistently good control on medications, and depression in full remission as of September 2017. (R. 18, 21, 326, 355, 454, 541, 550, 668-75, 677-78, 683-84, 700, 717, 724, 727, 736, 741-42, 746-47, 767).

Under the circumstances here, any error in the ALJ's failure to separately address Plaintiff's mental impairments as part of the RFC discussion was harmless. *See Fody*, 169 F. Supp. 2d at 809; *Chic Z. v. Saul*, No. 18 C 2142, 2019 WL 7500241, at *3, n.2 (C.D. Ill. Dec. 9, 2019) ("The ALJ expressly analyzed the impact of Plaintiff's depression on her ability to perform work related activities. . . The Court will not remand this case simply for the ALJ to move his analysis of Plaintiff's mild mental impairment to a different page of his written decision when the result will not change.") (citing *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) (stating that a case will not be remanded to the ALJ for further explanation if the court "can predict with great confidence that the result on remand would be the same")). Viewing the record as a whole, the ALJ's mental RFC

determination is supported by substantial evidence, and Plaintiff's request to remand the case for further consideration of this issue is denied.

### D. Subjective Statements

Plaintiff finally challenges the ALJ's assessment of her subjective symptom allegations. (Doc. 13, at 14-16; Doc. 25, at 14-16). The regulations describe a two-step process for evaluating a claimant's own description of her impairments. SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." *Id.* at *3. Second, if there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . . " *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations . . . and justify the finding with specific reasons." *Villano*, 556 F.3d at 562.

The Court gives the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is patently wrong. *See Horr v. Berryhill*, 743 Fed. Appx. 16, 20 (7th Cir. 2018).

As the ALJ explained, Plaintiff stopped working in 2010 or 2011 because she was let go, not because of any medical impairment, but testified that she could not have worked as of the August 2012 alleged onset date due to right foot (big toe) pain. (R. 23, 25, 53-54, 57, 62-63). The ALJ acknowledged that Plaintiff claimed: her foot problems sometimes interfered with her ability to walk, affected her ability to lift, and limited her ability to stand to around two hours; and problems with her right big toe affected her abilities to crouch and bend. (R. 22, 23, 54, 58, 65-67). The ALJ also noted that Plaintiff alleged having constant right foot pain and sitting most of the time with the foot "up high." (R. 23, 244). Specifically, she elevated the foot due to tingling and throbbing. (R. 23, 59, 68, 72).

Plaintiff argues that, in discounting her statements about right foot problems, the ALJ failed to properly evaluate her activities of daily living. (Doc. 13, at 14-15). To the contrary, the ALJ expressly found that Plaintiff's various activities—including shopping, driving, vacuuming, cooking, caring for and spending time with her grandchildren and ill mother with her husband's assistance, and attending festivals—as well as the medical evidence failed to support the claim that she experienced constant pain and spent most of the time sitting with her foot elevated. (R. 22, 23, 54, 60, 63-65, 73-74). The ALJ relied in part on physical therapy notes showing that: Plaintiff did household tasks, used a computer, and cared for her grandchildren; and she stated her activities were limited only a little of the time. (R. 24, 25, 611, 621, 650). While Plaintiff insists that her participation in her mother's care was minimal (Doc. 13, at 16; Doc. 25, at 15-16), the ALJ determined that Plaintiff "downplayed" caring for her mother at the hearing based on psychiatric treatment notes in 2016 and 2017 indicating that Plaintiff was the "sole caregiver" for two

years until her mother moved to an assisted living facility, and the caretaking demands from her mother "restricted activities she want[ed] to do." (R. 25, 63-65, 73-74, 729, 756).

In addition, the ALJ focused on evidence demonstrating that, contrary to allegations of difficulty walking, Plaintiff consistently presented with normal gait at doctors' visits. (R. 20, 24, 25, 29, 458-62, 539-40, 546-47, 549-50, 678, 700, 781-82, 786-87). Moreover, Dr. Kelikian imposed no walking restrictions following Plaintiff's right foot surgery in February 2015. (R. 29). Plaintiff also testified that the surgery helped. (R. 23, 57-58, 72). And she stopped regular orthopedic follow-up for the foot after 2016. (R. 20, 29).

Finally, contrary to Plaintiff's suggestion (Doc. 13, at 16), the ALJ recognized Plaintiff's testimony that she had taken Tramadol for pain since 2015. (R. 20, 23, 29, 55-56, 63). The ALJ found that mental health treatment notes in October 2017 nonetheless evidenced a three-month period during which Plaintiff did not take Tramadol. (R. 30, 719). Plaintiff dismisses this as a "minor discrepancy" (Doc. 25, at 16), but the ALJ explained that this evidence, too, was at odds with her allegations of daily chronic pain. (R. 30).

An ALJ's credibility assessment "need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber*, 519 Fed. Appx. at 961). And "[a]s the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'" *Richard C. v. Saul*, No. 19 C 50013, 2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). Here, the ALJ provided several valid reasons for discounting

Plaintiff's complaints of disabling symptoms, and substantial evidence supports that decision.

**<u>CONCLUSION</u>**

For the reasons stated above, Plaintiff's request for remand (Doc. 13) is denied, and the Commissioner's motion for summary judgment (Doc. 20) is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated:  June 1, 2021

SHEILA FINNEGAN
United States Magistrate Judge